# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KAREN WALKER,                          )
                                       )
      Plaintiff,              )
                                       )
    vs.                            )        **Case No. 4:08CV388 MLM**
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security        )
                                       )
      Defendant.              )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Karen Walker ("Plaintiff") for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. § 1381, et seq. Tr. 50-52, 40-44. Plaintiff filed a Brief in Support of the Complaint. Doc. 16. Defendant filed a Brief in Support of the Answer. Doc. 19. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. §636(c)(1). Doc. 7.

## I.
## PROCEDURAL HISTORY

Plaintiff filed application for disability benefits on May 9, 1996, and on May 27, 1999. Pursuant to her second application Plaintiff was found disabled and awarded benefits through January 1, 2004, upon which date she was found no longer disabled. Tr. 12. On July 27, 2005, Plaintiff filed

a third application for benefits alleging a disability onset date of September 17, 1998. Tr. 12, 49-52. Plaintiff subsequently amended her alleged disability onset date to January 2, 2004. Tr. 12, 25.

Plaintiff's application was denied on November 4, 2005. Tr. 40-44.[1] On December 27, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 39. A hearing was held before ALJ Jhane Pappenfus on May 30, 2006. Tr. 196-221. By decision dated September 14, 2006, the ALJ determined that Plaintiff was not under a "disability" as defined by the Act and, therefore, not eligible for benefits. Tr. 9-22.

Plaintiff filed a request for review with the Appeals Council on October 5, 2006. Tr. 7-8. On February 5, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 3-6. As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that, at the time of the hearing, she lived in an apartment with her mother; that she did not graduate from high school; that she dropped out of a GED program; that she attended beauty college; that she did not graduate from beauty college; that she has a 21-year old daughter, a 17-year old daughter, and a 14-year old son; that her 21-year old daughter has a child and lives on her own in an apartment; that her 17-year old daughter stays with the daughter's father; that her 14-year old son lives with his father's mother; and that her children stay with Plaintiff at Plaintiff's mother's apartment from time to time. Tr. 200-02, 214, 217-18.

---

[1]     Missouri is one of several test states participating in modifications to the disability determination procedures which apply to this case. See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466. These modifications include, among other things, elimination of the reconsideration step and the elimination of the Appeals Council review step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from the initial denial to the hearing level.

Plaintiff testified that she experiences pain in her left shoulder, right shoulder, left arm, right arm, left knee, back, and neck; that the pain in her left shoulder increases if she moves it; that the pain in her left shoulder precludes her from being able to take baths because she cannot get out of the bathtub; that the pain in her left arm makes it difficult to get in and out of the shower; that the pain in her left arm precludes her from typing and driving a car; that the pain in her left shoulder precludes her from picking up her twenty-pound "grand baby" and a gallon of milk; and that the pain in her left shoulder does not preclude her from picking up a cup. Tr. 204-206. Plaintiff also testified that the pain on the left side of her body starts at the shoulder cuff and goes down her whole arm all the way to her hand; that this pain occurs everyday; and that there is not anything she does for her left arm or left shoulder that relieves or reduces the pain. Tr. 206-207.

Plaintiff testified that she can "reach up a little bit" with her right shoulder; that reaching out in front of her causes pain; that a doctor she visited told her that structurally her right shoulder is fine; that sometimes her right hand and right arm go numb; and that the numbness "depends on how [she] lay[s] in the bed." Tr. 207-209. Plaintiff further testified that she experiences severe pain all around in her neck, especially on the left side; that her neck hurts when she looks up, right, left, and down; and that she was taking medication for neck pain. Tr. 209-11. Plaintiff said that her left knee swells when its gets cold outside, when the weather changes, when she stands too long, and when sits too long; that she treats the swelling by using Icy Hot, by wrapping it, and by propping up her leg; and that Christian Hospital Northeast told her that "the cuff of [her] arm done [sic] came apart"; that "staples [were] falling down in [her] chest and in [her] arm"; and that she had arthritis in her neck. Tr. 203, 212.

Plaintiff testified that she "know[s] how to drive [a vehicle] but it bothers [her] to drive"; that she visits friends or relatives sometimes every "six to seven months"; that she attends church services "[m]aybe once or three times a year"; that she has no problems reading or watching television; that she does not take care of her grandchildren; that she does not do any kind of outdoor activity; that she does not do any work around her mother's house; that she does not do the laundry; that she does not go to the grocery store; that she does not cook; and that she does not do the dishes. Tr. 213-15.

Plaintiff testified that at the time of the hearing she was depressed and taking medicine for depression and. Plaintiff further testified that, "I've been like this, depressed since I was 16, since I broke my shoulder." Tr. 220.

### III.
### MEDICAL RECORDS

The Administrative Record includes an unsigned and undated Social Security Administration Disability Determination Rationale which states that records considered included a report from Christian Hospital Northeast, received October 16, 2003, a report from Peoples Health Center, received October 20, 2003, a report from Lois Mades, Ph.D., received November 25, 2003, and a report from Jack Tippett, received November 12, 2003. The Rationale states that Plaintiff had been receiving disability due to physical impairments and psychological impairments; that a "decision of not disabled is being recommended [for Plaintiff]"; that [Plaintiff] is capable of at least simple work"; that "current medical evidence demonstrates medical improvement with [Plaintiff] now having the ability to perform work which is not demanding"; that "[Plaintiff's] physical impairments are not as restricted"; that Plaintiff is capable of light work; that Plaintiff "is capable of at least simple work"; that jobs which Plaintiff can perform include "taper, printed circuit layout," "surveillance system

monitor," and "house sitter"; and that, therefore, "a decision of not disabled is being recommended." Tr. 106-07.

In Medical Consultant's Review of Physical Residual Functional Capacity ("RFC") Assessment, completed on January 16, 2004, Charles K. Lee, M.D., stated that he "agree[d]" with the conclusions stated in a Physical Residual Functional Capacity ("RFC") Assessment. The Transcript, however, does not include a Physical RFC Assessment which pre-dates Dr. Lee's Review. Tr. 100-01.

A Medical Consultant's Review of Mental RFC Assessment, completed on January 16, 2004, by Judy K. Martin, M.D., states that Dr. Martin agreed with conclusions of a Mental RFC Assessment. The Transcript, however, does not include a Mental RFC Assessment with pre-dates Dr. Martin's Review. Tr. 102-03.

A Medical Consultant's Review of Psychiatric Review Technique Form, completed on January 16, 2004, by Dr. Martin states that Dr. Martin agreed with the conclusions stated in a Psychiatric Review Technique Form. The Transcript, however, does not include a Psychiatric Review Technique Form which pre-dates Dr. Martin's Review. Tr. 104-105.

A Physical RFC Assessment, completed on May 24, 2004, by John. R. Raabe, M.D., states that "the severity of [Plaintiff's] allegations are disproportionate to the objective findings, including x-rays: the claimant is thus felt partially credible"; that Plaintiff can occasionally lift and/or carry twenty pounds, frequently lift and/or carry twenty pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and is limited in the upper extremities in terms of pushing and/or pulling; that Plaintiff can frequently climb, balance, stoop, kneel, crouch, and crawl; that Plaintiff has decreased ROM and pain in her left shoulder; that

Plaintiff is limited in her ability to reach in all directions (including overhead) due to her left shoulder/arm and is unlimited in her handling, fingering, and feeling abilities; and that Plaintiff has no visual, communicative, or environmental limitations. Tr. 127-34.

A Mental RFC Assessment, completed on June 25, 2004, by Robert Rocco Cottone, Ph.D., states that Plaintiff is not significantly limited in the ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to make simple work-related decisions, to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to change in the work setting, and to be aware of normal hazards and take appropriate precautions; that Plaintiff is moderately limited in regard to the ability to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, and to set realistic goals or make plans independently or others; that Plaintiff is markedly limited in regard to the ability to understand and remember detailed instructions and to carry out detailed instructions; and that Plaintiff has no evidence of limitation in regard to the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances and in regard to travel in unfamiliar places or use public transportation. Tr. 108-11.

A Psychiatric Review Technique Form, completed on June 25, 2004, by Dr. Cottone states that Plaintiff has a depressive disorder not otherwise specified; that Plaintiff has no functional limitation in regard to episodes of decompensation; that Plaintiff has mild limitations in regard to restrictions of activities of daily living and difficulties in maintaining concentration, persistence or pace, and that Plaintiff has moderate limitations in regard to difficulties in maintaining social functioning. Dr. Cottone also stated in the Psychiatric Review Technique Form that in May 1999 he evaluated Plaintiff's mental functioning as part of a continuing disability review; that Plaintiff had been awarded benefits based on a physical and mental impairment; that when Plaintiff was awarded benefits she could not tolerate "even minimal stress on a job" and had "depressed mood with lability"; that in November 2003 Plaintiff was mildly depressed and had a GAF of 65-70; that medical improvement had occurred; and that Plaintiff needed a Mental RFC Assessment. Tr. 112-26.      A Female Exam report from Family Medical Group, P.A., dated September 30, 2004, states that Plaintiff was normal in regard to her appearance, ENT, respiratory system, cardiovascular system, gastrointestinal system, and genitourinary system; that her abduction was limited to ninety degrees on the left; that she was oriented times three; and that her mood and affect were normal. Tr. 189.

Records from People's Heath Centers, dated August 5, 2005, state that Plaintiff's "chief complaint" was bilateral foot swelling; that Plaintiff also reported shoulder pain and that Alleve gave her "some relief"; that Plaintiff had "pedal edema"; that Plaintiff's diagnosis was shoulder pain and elevated blood pressure; that Plaintiff's left shoulder had full range of motion and normal external rotation. Tr. 180, 182.

Records of Christian Hospital Northeast Emergency Department dated September 13, 2005, state that Plaintiff presented complaining of left shoulder pain and that Plaintiff said that she had

surgery on her shoulder in 1989, that she woke up with pain that morning, and that ibuprofen "helped." Records of this date further state that a musculoskeletal exam showed that "ROM [was] limited"; that "[t]he left anterior shoulder [was] tender on palpation without swelling without eccymosis"; that it was worse with hypertension; that no deformity in the shoulder was noted; that shoulder motor and sensory function were intact, bilaterally; that vascular signs were normal in the shoulders, bilaterally; and that the clavical was normal bilaterally. Records of Plaintiff's September 2005 emergency room visit further state that Plaintiff was prescribed Naprosyn, as needed, for pain and Flexeril, as needed, for muscle spasm; that Plaintiff's examination showed evidence of "osteoarthritis, a degeneration of the joints," which condition is "common in people past middle age"; that "osteoarthritis is usually not crippling and does not progress too rapidly"; that to minimize the pain it was recommended that Plaintiff avoid high impact activities, maintain an ideal weight or lose weight if needed, exercise regularly, and engage in low impact exercises such as walking, biking and swimming. Additionally, x-rays of Plaintiff's left shoulder taken during the September 2005 emergency room visit showed that there was "[n]o fracture or dislocation" and that there was a metallic staple "transfixing the surgical neck of the left humerus." X-rays of Plaintiff's cervical spine showed normal alignment and "no fractures or dislocations," "[d]egenerative ostephytes . . . radiating anteriorly and posteriorly of the bodies of C5 ," "marked narrowing of the neural central joints," "ostephytic encroachment of the nural foramina bilaterally at the C5-6 level, and "[n]o prevertebral soft tissue swelling." Tr. 166-76.

Elbert H. Cason, M.D., of the Forest Park Medical Clinic evaluated Plaintiff on October 19, 2005. Dr. Cason's report states that Plaintiff complained of pain in both shoulders, her neck, and left knee, and of high blood pressure; that Plaintiff said she was not taking any medication for blood

pressure; that upon examination Plaintiff's blood pressure was 133/88; that this blood pressure rate was "normal"; that she had no symptoms of high blood pressure including shortness of breath, headaches, myocardial infarctions, strokes or nephropathies; that Plaintiff said she was able to walk a block, stand ten minutes, and "go up three flights of stairs"; that Plaintiff said that in her average day she sits and watches television and sleeps five hours and that she "gets out of the house three times a week"; and that Plaintiff said that she smokes ten cigarettes a day. Dr. Cason's report states that Plaintiff weighed 176 and was 66 inches tall and overweight. Pursuant to a range of motion examination, Dr. Cason reported that Plaintiff's flexion was 150 degrees in her right shoulder and 90 degrees in her left shoulder; that Plaintiff's abduction was 150 degrees in her right shoulder and 90 degrees in her left shoulder; that Plaintiff's adduction was 30 degrees in her right shoulder and 20 degrees in her left shoulder; that Plaintiff's internal rotation was 80 degrees in her right shoulder and 40 degrees in her left shoulder; and that Plaintiff's external rotation was 90 degrees in her right shoulder and 60 degrees in her left shoulder. Dr. Cason's report further states that Plaintiff's right shoulder motion was normal and the left shoulder motion was decreased; that Plaintiff had some tenderness over the left shoulder; that there was no swelling or inflammation in the left shoulder; and that there was no evidence of any instability, contracture, or ankylosis of any joint. Dr. Cason also stated that Plaintiff's strength was a five out of five for grip in both her left and right hands, for her upper extremity muscles, both left and right sides, and for her lower extremity muscles, both left and right sides. Upon examination, Dr. Cason reported that Plaintiff's lungs were clear to auscultation and percussion; that Plaintiff's extremities were without cyanosis, clubbing or edema; that Plaintiff could "heel and toe stand and squat by holding onto the edge of the desk"; that Plaintiff's gait was normal; that her straight leg raises were normal; that major muscle group strengths of the lower

extremities was normal"; that Plaintiff's ankle motion was normal; that Plaintiff had no swelling in either knee; that Plaintiff's elbow motions were normal; that major muscle group strengths of the lower extremities were normal; that in regard to grip, Plaintiff could use her fingers for buttoning, writing, using small tools or parts; that Plaintiff was alert and "oriented x3"; that the only joint which Dr. Cason found to be tender was in the left shoulder area; and that he found "no evidence of instability, contracture, or ankylosis of any joint." In summation, Dr. Cason reported in regard to Plaintiff's complaint of shoulder pain, that Plaintiff had normal motion in the right shoulder and decreased motion in the left shoulder; in regard to Plaintiff's complaint of neck pain, that she had full range of motion of the cervical spine and tenderness in the posterior cervical area; in regard to Plaintiff's complaint that her left knee swells, that she had normal range of motion in both knees and no swelling of the left knee; and in regard to Plaintiff's complaint of high blood pressure, that her pressure was normal. Tr. 160-65.

A Physical RFC Assessment, dated November 4, 2005, completed by Disability Examiner R. Manning, states that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday; that Plaintiff is unlimited in the ability to push and/or pull; that Plaintiff has no postural, visual, communicative, or environmental limitations; that Plaintiff is "limited" in the ability to reach in all directions, including overhead, with the "left upper extremity, due to pain and decreased ROM"; that Plaintiff is "unlimited" in handling, fingering, and feeling; and that Plaintiff's "statements c/w available evidence." Tr. 75.

Treatment notes dated May 2, 2006, prepared by Christopher Kuebrich, M.D., state that Plaintiff complained of "pain in left side of neck and shoulder"; that Plaintiff was diagnosed with

"rotator cuff syndrome" and "depression"; and that Plaintiff was prescribed Celebrex and Zoloft. Tr. 159.

An August 14, 2006 handwritten note addressed to "Whom It May Concern" and signed by Dr. Kuebrich states that Plaintiff "suffers from chronic pain, most likely secondary to previous trauma"; that Plaintiff's pain "is most intense in her neck and left shoulder"; and that "plain films of these areas confirm both metallic implants from prior surgery and radiographic changes consistent with osteoarthritis." Tr. 156.

An Adult Medicine History & Physical Form from People's Health Centers, dated January 5, 2007, states that Plaintiff presented for shoulder pain and was seeking a "new referral" for an "ortho evaluation as she was unable to keep"[2]; that Plaintiff reported that she injured her shoulder "several years ago (while she was a teenager)"; that Plaintiff had limited range of motion in both shoulder joints due to her report of pain; that the plan for Plaintiff, regarding left shoulder pain, was to continue Celebrex and refer to St. Louis Connect Care Orthopedics Department; and that the plan for Plaintiff, regarding depression, was to continue Zoloft. Tr. 193-94.

## IV.
## LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is

---

[2]     This sentence is not completed.

determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.  Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e).  The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f).  Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis,

the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater,

87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ failed to properly consider her RFC because he failed to consider the medical evidence of record and Plaintiff's medically determined impairments; that the ALJ failed to insure that the record was properly developed; that the ALJ's decision that Plaintiff's depression was nonsevere is medical conjecture and not based on substantial evidence; that because Plaintiff had "significant nonexertional limitations" the ALJ should have solicited the testimony of a vocational expert; and that, therefore, the decision of the ALJ is not supported by substantial evidence.

**A.      ALJ's Decision the Plaintiff's Depression is Not Severe:**

The ALJ noted that Plaintiff has depression, but found, at Step 2 of the sequential analysis, that this depression is not severe. Plaintiff contends that the ALJ's finding that her depression is non severe is not based on substantial evidence.

**1.      Legal Framework:**

As stated above, at Step 2 of the sequential analysis an ALJ is required to determine if a claimant has a severe impairment or combination of impairments. "The severity Regulation adopts a standard for determining the threshold level of severity: the impairment must be one that

'significantly limits your physical or mental ability to do basic work activities.'" Bowen v. Yuckert, 482 U.S. 137, 153 n.11 (1987) (quoting 20 CFR § 404.1520(c) (1986)). An impairment or combination of impairments are not severe if they are so slight that it is unlikely that the claimant would be found disabled even if his age, education, and experience were taken into consideration. Id. at 153 ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account."). Moreover, "'[a]n impairment imposes significant limitations when its effect on a claimant's ability to perform basic work is more than slight or minimal.'" Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994) (quoting Cook v. Bowen, 797 F.2d 687, 690 (8th Cir. 1986)). 20 C.F.R. § 404.1521(b) defines basic work activities as follows:

> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include–
>
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

The Eighth Circuit has acknowledged that the "dismissal of an application for benefits at step two is justified only for 'those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account.'" Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).

In regard to mental impairments, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Section 12.00(a) further lists mental disorders in diagnostic categories, which include, among others, mental disorders (§ 12.02), affective disorders (§ 12.04), mental retardation (§ 12.05), anxiety related disorders (§ 12.06), and personality disorders (§ 12.08).

A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam). The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. 20 C.F.R. § 404.1520a states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § § 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1)

activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The court further notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

**2.     Application of Law to Facts Regarding Plaintiff's Depression:**

In the matter under consideration, upon finding that Plaintiff's alleged depression is not severe, the ALJ considered the medical evidence, as required by the first step of a mental impairment analysis, as well as Plaintiff's functional limitations. See Pratt, 956 F.2d at 835; 20 C.F.R. §§404.1520a(b)(1), 404.1508. In particular, the ALJ considered that while Plaintiff's medical records indicate that she suffers from depression:

> [Her] mental impairments have not resulted in any hospitalizations and she has not seen a mental health professional, such as a psychiatrist or psychologist, specifically for her mental impairments. The claimant testified she has had depression since she was 16 years old. It seems logical that in the almost 26 years since she has allegedly had depression, she would see a mental health professional or be hospitalized if her impairment is significant. She has not. Because she has not received regular treatment for her mental impairments, it is impossible to tell how her mental impairments would respond to both medication and therapy.

Tr. 18.

Indeed, the record does not reflect that Plaintiff sought regular treatment for her depression. Rather, it reflects only that she took medication for this condition. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See  Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987). Further, in regard to the absence of records reflecting that Plaintiff received treatment for or  was hospitalized for depression, seeking limited medical treatment is inconsistent with claims of disability. Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (citing Benskin, 830 F.2d at 884) (holding that the "claimant's failure to seek regular medical treatment for . . . depression" is a legitimate factor in the

rejection of a claimant's subjective complaints). Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989).

Consistent with the requirement of § 404.1520(a), after considering the medical evidence, the ALJ proceeded to consider Plaintiff's functional limitations as evidenced by activities of daily living; her social functioning; her persistence or pace; and her deterioration or decompensation in work or work-like settings as required by 20 C.F.R. § 404.1520a(b)-(c). See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (holding that while an ALJ is not limited to considering medical evidence of a mental impairment, the ALJ is required to consider at least some supporting evidence from a professional). In particular, the ALJ considered that Plaintiff's "mental impairment has less than a minimal effect on her activities of daily living, social functioning, concentration and task persistence, and her ability to tolerate the increased mental demands associated with competitive work." Tr. 18.

To the extent that Plaintiff suffers from some level of depression, "[t]he mere existence . . . of a mental disturbance is not per se a disability within the meaning of the [SSA]." Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). See also Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) ("Depression, however, is not necessarily a disability."). Thus, the mere fact that Plaintiff was prescribed and was taking anti-depressants is not sufficiently conclusive to show that Plaintiff's depression was severe enough to substantially limit her ability to engage in work activities. See Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (holding that where a claimant's psychiatric problems "did not significantly limit his ability to think, understand, communicate, concentrate, get along with other people, and handle normal work stress" and where the claimant's psychiatric problems did not "significantly limit the performance of any basic work," his depression was not severe); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (holding that anxiety did not substantially limit a claimant's

work activities where the claimant did not seek counseling, psychiatric treatment, or hospitalizations despite the fact that claimant had a twenty-eight-year history of taking anti-anxiety agents). Dr. Cottone concluded, moreover, consistent with the Regulations, that despite Plaintiff's depressive symptoms, Plaintiff can understand, remember, carry out, and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers and supervisors, and adjust adequately to ordinary changes in work routine and setting.

The court finds that the ALJ's consideration of Plaintiff's depression and his determination at Step 2 of the sequential analysis that her depression is not severe is based on substantial evidence on the record and that it is consistent with the Regulations and case law.

**B.      Plaintiff's RFC:**

Plaintiff contends that the ALJ failed to consider the effect of her physical impairments on her RFC and that she did not properly determine her RFC according to the applicable Regulations and case law.

The ALJ found that Plaintiff has the RFC to perform light exertional work and that Plaintiff is limited to only occasional movement of her left arm of greater than ninety degrees. Tr. 19.

Light work, as that term is defined under the Social Security Act, "involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls." Id. "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." Id.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d, 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC

is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo, 377 F.3d at 806. "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at Step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At Step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at Step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. In any case, "[a] disability claimant has the burden to establish her RFC." Eichelberger, 390 F.3d at 591 (citing Masterson, 363 F.3d at 737).

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737; Harris, 356 F.3d at 929. Upon determining Plaintiff's RFC, the ALJ in the instant matter considered Plaintiff's allegations of physical disability and pain and considered numerous factors.

First, the ALJ considered that Plaintiff's left shoulder is not her dominant shoulder and that during the hearing Plaintiff used her left shoulder to "ruffle through her paperwork, which illustrates some functionality of her left arm and hand despite the left shoulder surgery." Tr. 15. The ALJ further considered Plaintiff's "generally unpersuasive appearance and demeanor and her testimony at her hearing." Tr. 19. According to the ALJ, Plaintiff "raised and moved her right arm during her testimony in an effort to demonstrated [sic] that she could not raise and move her right arm." Tr. 19. Thus, upon reaching her conclusion regarding Plaintiff's RFC, the ALJ combined her review of the record as a whole with his personal observations. While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). See also Strongson, 361 F.3d at 1072 ("ALJ [is] in a better position than this court to assess [a claimant's] credibility."); Casey v. Astrue, 503 F.3d 687, 698 (8th Cir. 2007) ("If an ALJ explicitly discredits the

claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.").

Second, the ALJ noted that treatment gaps between January 2004 and September 2004, October 2004 and August 2005, and October 2005 and April 2006 undermine Plaintiff's credibility concerning her allegations of disabling pain and disabling impairments. Tr. 15. Such gaps suggest that Plaintiff's subjective complaints of disabling pain are not entirely credible. See Siemers, 47 F.3d at 302 (citing Benskin, 830 F.2d at 884) (holding that the "claimant's failure to seek medical treatment for pain" is a legitimate factor for an ALJ to consider in rejecting a claimant's subjective complaints of pain). In regard to these gaps, the ALJ considered that Plaintiff testified that she did not have medical insurance during these periods. The ALJ further considered that the record does not reflect that Plaintiff was refused medical treatment because she had insufficient funds; that Plaintiff ever sought aid to defray the cost of medical treatment; or that Plaintiff discussed alternative methods of payment with her physicians. The ALJ concluded that the record does not substantiate Plaintiff's claim that lack of medical insurance was the reason she failed to seek treatment. Tr. 15. Seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James, 870 F.2d at 450. In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). In this matter, however, as noted by the ALJ, the record does not substantiate Plaintiff's claim that she did not seek medical treatment because of limited resources. Moreover, even assuming that Plaintiff's financial resources were insufficient, as noted by the ALJ, the record does not reflect that Plaintiff sought financial aid or treatment offered

to indigents. Such a failure detracts from her claim that she did not seek medical treatment because of inadequate financial resources. See Riggins, 177 F.3d at 693.

Third, the ALJ noted that Plaintiff did not adhere to her treating physician's recommendation that she consult with an orthopedist and found that this failure suggests Plaintiff's symptoms were not as serious as she alleged. Tr. 15. Indeed, medical records from Family Medical Group, dated September 30, 2004, state that Plaintiff would be referred to an orthopedist and that Plaintiff would schedule an appointment. Tr. 189. The record does not reflect that Plaintiff complied with this referral suggestion. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain).

Fourth, the ALJ considered that despite the alleged disabling pain Plaintiff experienced, she testified that she did not begin using pain medication until May 2005. The ALJ also considered that medical records reflect that treatment in the form of ibuprofen "proved completely effective" to alleviate Plaintiff's pain upon a September 2005 emergency room visit. These factors suggest that Plaintiff's subjective complaints are vulnerable to questions of credibility. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that the fact that medicine is effective and the fact that a claimant fails to take strong doses of pain medication are legitimate factors under Polaski to discredit subjective complaints of pain). See also Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) (citing Murphy, 953 F.2d at 386) ("A lack of strong pain medication is inconsistent with subjective complaints of disabling pain."); Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) ("[C]laimant's

allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications"); Cruse, 867 F.2d at 1187; Rautio, 862 F.2d at 179 (holding that limited use of prescription medications is not suggestive of disabling back pain); Benskin, 830 F.2d at 884 (holding that treatment by hot showers and doses of Advil/aspirin do not indicate disabling pain).

Fifth, the ALJ considered the objective medical evidence. In particular, in regard to Plaintiff's left shoulder pain, the ALJ noted that nothing in the records documents the presence of long term and significant atrophy or loss of muscle tone in and around Plaintiff's left shoulder and that x-rays of Plaintiff's left shoulder indicate no fracture or dislocation. The ALJ further considered that when Plaintiff was examined on August 5, 2005, her left shoulder had full range of motion and normal external rotation; that on August 9, 2005, she had no complaints relating to her shoulder; and that subsequent records from the People's Health Center reflect that Plaintiff had left shoulder abduction to ninety degrees. Furthermore, despite the diagnosis of left shoulder cuff syndrome, the ALJ noted that Dr. Cason reported upon examination in October 2005 that Plaintiff had no exertional limitations in regard to her shoulders, that her grip was 5/5 in each hand, and that her upper extremity strength was 5/5 on both sides. The ALJ also considered that in September 2005, upon Plaintiff's presenting at Christian Hospital Northeast complaining of left shoulder pain, it was reported that Plaintiff had no muscle myalgias or left shoulder muscle weakness and that there was no swelling in the left shoulder.

In regard to Plaintiff's allegation of cervical limitations, the ALJ considered that a September 2005 x-ray of her cervical spine showed normal alignment with no fractures or dislocations; that although impairments were revealed in an x-ray, they did not result in atrophy; that Dr. Cason found

no strength or range of motion limitations in Plaintiff's upper or lower extremities and only tenderness in the posterior cervical area; and, as stated above, that Dr. Cason found that Plaintiff's grip was 5/5 in each hand. The ALJ also considered that upon presenting to Christian Hospital Northeast in September 2005, Plaintiff reported no back pain.

In regard to Plaintiff's allegation that she is disabled based on hypertension, the ALJ considered that Dr. Cason reported that Plaintiff's blood pressure was 133/88; that the record does not reflect that she was taking blood pressure medication; and that the record does not reflect that Plaintiff's elevated blood pressure resulted in complications. The court notes that Dr. Cason reported that Plaintiff's blood pressure of 133/88 was "*normal*" and that she had *no symptoms of high blood pressure* including shortness of breath or headaches. Tr. 160-61. (emphasis added). See Murphy, 953 F.2d at 384 (holding that a high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.00 C).

The court notes that Dr. Cason also reported that Plaintiff's gait, ankle motion, elbow motions, and major muscle group strengths of the lower extremities were normal and that despite Plaintiff's complaint of swelling in the knees, she had normal range of motion in both knees and no swelling of the left knee.

To the extent that the ALJ found that there was a lack of clinical findings to support Plaintiff's complaints of disability due to shoulder, cervical, and knee pain and high blood pressure, the court finds that the ALJ's decision is supported by substantial evidence. Further, to the extent that the ALJ

found that the lack of such evidence detracts from Plaintiff's claim that she is disabled, this finding

is consistent with the Regulations and case law.  See Edwards v. Barnhart, 314 F.3d 964, 966 (8th

Cir. 2003) ("Subjective complaints can be discounted [ ] where inconsistencies appear in the record

as a whole." (citing Polaski, 739 F.2d at 1322); Siemers, 47 F.3d at 302 (holding that the "lack of

clinical findings to support claimant's claims of disabling pain" is a legitimate factor for an ALJ to

consider in rejecting a claimant's subjective complaints of pain); Matthews, 879 F.2d at 425 (holding

that the "lack of clinical findings to support claimant's claims of disabling pain" is a legitimate factor

for ALJ to consider in rejecting a claimant's subjective complaints of pain).

To the extent Plaintiff contends that the ALJ did not properly consider the Physical RFC

Assessment completed by Dr. Raabe, Dr. Raabe completed his Assessment in May 2004.  While

Plaintiff's alleged disability onset date is in January 2004, the oldest actual treatment record presented

is from a September 30, 2004 clinic visit.  On this date it was reported that Plaintiff's abduction was

limited to ninety degrees on the left.  The ALJ took this limitation into consideration upon

determining Plaintiff's RFC.  Moreover, Dr. Raabe concluded that Plaintiff could occasionally lift

twenty pounds and frequently lift ten pounds and that she could stand, walk, or sit about six hours

in a normal work day.  While Dr. Raabe found that Plaintiff was limited in the upper extremities, he

only limited her overhead lifting to her left arm.  Moreover, the record does not include clinical

findings to support Dr. Raabe's statements that Plaintiff was limited in the ability to reach in all

directions.  Significantly, Dr. Raabe found Plaintiff's claims regarding her symptoms to be only

"partially credible" and reported that the severity of Plaintiff's allegations "are disproportionate to

the objective findings." Tr. 132.  The record does not reflect that Dr. Raabe, a State agency

consultant, actually examined Plaintiff.  It is well settled that the report of a consulting physician who

has seen the claimant only once is of little significance by itself. <u>Browning v. Sullivan</u>, 958 F.2d 817,

821 (8th Cir. 1992). <u>See also</u> <u>Turpin v. Bowen</u>, 813 F.2d 165, 170 (8th Cir. 1987) ("[T]he report

of a consulting physician who examine[s] a claimant once does not constitute 'substantial evidence'

upon the record as a whole."); <u>Piercy v. Bowen</u>, 835 F.2d 190, 191 (8th Cir. 1987). In any case, the

ALJ did consider Dr. Raabe's Physical RFC Assessment and correctly noted that according to SSR

96-6p it "can be given weight only to the extent it is supported by the evidence and consistent with

the record as a whole." [3]

The ALJ in the matter under consideration first identified Plaintiff's functional limitations and

restrictions and then assessed her work-related abilities on a function-by-function basis. <u>See</u>

<u>Masterson</u>, 363 F.3d at 737; <u>Harris</u>, 356 F.3d at 929. Only after considering the clinical evidence and

the record as whole did the ALJ find that Plaintiff can lift a maximum of twenty pounds, frequently

lift ten pounds, stand or walk for six hours in an 8-hour workday and that she is limited to only

occasional movement of her left arm greater than ninety degrees. Indeed, the ALJ considered

Plaintiff's restrictions and how they affect her capacity to do work-related physical and mental

activities. <u>See</u> SSR 96-8p at *2. The ALJ further considered the demands of light work and

---

[3]    SSR 96-6p states:

1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.

2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

concluded based on Plaintiff's work-related abilities that she has the RFC to perform light work with the stated limitation in regard to her left arm.

The court finds that the ALJ's conclusion that Plaintiff can engage in light exertional work, with the stated restriction in regard to her left arm, is consistent with her findings regarding the medical evidence and Plaintiff's credibility and that it is based on substantial evidence on the record. Additionally, the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence on the record as a whole and is consistent with all of the relevant evidence, the Regulations, and case law. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).  As such, the court finds that Plaintiff's allegations that the ALJ failed to consider the effect of her physical impairments on her RFC and that the ALJ did not properly determine her RFC are without merit.

## C.    Vocational Expert Testimony:

Plaintiff contends that the ALJ should have solicited the testimony of a vocational expert to determine whether there is work which Plaintiff can perform.  Plaintiff further argues that because she has significant non-exertional limitations, the ALJ improperly relied upon the Medical-Vocational Guidelines.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no non-exertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity.  Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can

perform. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). <u>See also</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines. <u>See</u> <u>Robinson</u>, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. <u>See</u> <u>id.</u> On the other hand, "'an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines.'" <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997) (quoting <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)).

SSR 83-10, 1983 WL 31251, at *1, clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

> [T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)
>
> To increase the consistency and promote the uniformity with which disability determinations are made at this step at all levels of adjudication, the regulations for determining disability were expanded in February 1979. Appendix 2 was provided to establish specific numbered table rules for use in medical-vocational evaluation.

SSR 83-10, 1983 WL 31251, at *6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

The Eighth Circuit has explained the circumstances when a claimant has nonexertional limitations but the ALJ need not resort to the testimony of a VE. The court held in Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

> "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349. "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir.1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions." Id.; See 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992).

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995); Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993) ("[T]he ALJ may rely on the guidelines to direct a conclusion of either disabled or not disabled without resorting to vocational expert testimony if the ALJ determines that a claimant's

nonexertional limitations do not *significantly* affect the claimant's RFC.") (emphasis added) (citing

Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988)).

In the instant matter the ALJ considered the above cited Regulations and case law upon determining whether he could rely upon the Guidelines. In particular, the ALJ stated as follows:

> The next step of the sequential evaluation requires that I compare the claimant's residual functional capacity with the residual functional capacity required to perform her past relevant work as described by claimant (Social Security Ruling 82-61). I also consider whether the claimant retains the residual functional capacity to perform the functional demands and duties of her past relevant work, as generally required by employers throughout the national economy.

Tr. 20.

The ALJ then determined that Plaintiff has no past relevant work as defined by the Regulations and that, therefore, the burden shifts to the Social Security Administration to show that there is other work in the economy which Plaintiff can perform. The ALJ noted that she could use the Guidelines if Plaintiff has the RFC to perform substantially all of the seven primary strength demands required by work at a given level of exertion. The ALJ concluded, based on the Guidelines, that Plaintiff's RFC and vocational background do not prevent her from making a successful vocational adjustment to work that exists in significant numbers in the national and regional economy. As such, the ALJ found that Plaintiff is not disabled.

The court finds that the ALJ's determination as to whether she could utilize the Guidelines is consistent with the Regulations and case law. In regard to Plaintiff's alleged non-exertional limitations, the ALJ found that Plaintiff's alleged depression has less than a minimal effect on, among other things, her social functioning, concentration, task persistence, and the ability to tolerate the mental demands associated with work. The ALJ concluded that Plaintiff's depression has less than

a minimal effect on her ability to perform work-related functions and that, therefore, her depression is not severe. The court has found above that the ALJ's conclusion regarding Plaintiff's depression is based on substantial evidence. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("Because the ALJ's determination that [the claimant] had a non-severe mental impairment was supported by substantial evidence, it was appropriate for the ALJ to rely upon the [Guidelines] to reach the conclusion that [the claimant] was not disabled."). Because substantial evidence supports the ALJ's decision that Plaintiff did not suffer from a disabling non-exertional impairment and/or that her non-exertional impairments do not significantly affect her RFC, the ALJ did not need to utilize the assistance of a vocational expert. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006) ("Where a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden at the fifth step may be met by use of the [Guidelines].") (internal citations omitted); Robinson, 956 F.2d at 841 ("Since the ALJ explicitly discredited the subjective complaints of pain, the ALJ properly refused to supplement the [Guidelines] on this ground."); Reynolds, 82 F.3d at 258; Reed v. Sullivan, 988 F.2d 812, 816   Additionally, the court has found above that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. Plaintiff's argument, that the ALJ should have utilized the testimony of a vocational expert, therefore, is without merit.  The court concludes that the ALJ properly relied upon the Guidelines and that her decision, based on the Guidelines, that Plaintiff is not disabled is supported by substantial evidence and is consistent with the Regulations and case law.

To the extent that ALJ may not have fully articulated that Plaintiff's non-exertional limitations do not prevent her from performing light work, such a deficiency in opinion-writing technique does

not require this court to set aside a finding that is supported by substantial evidence. See Reynolds v. Chater, 82 F.3d at 258.

**D.    Development of the Record:**

Plaintiff contends that the deficiencies in the ALJ's decision result from a failure of the ALJ to property develop the record. Specifically, Plaintiff suggests that the ALJ should have recontacted her treating physicians. The Eighth Circuit has only held such a duty to arise "if a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). While the Eighth Circuit has "consistently held that the ALJ must fully and fairly develop the record so that a just determination of disability must be made," the "ALJ is not required to function as the claimant's substitute counsel." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). As noted by the ALJ, Plaintiff provided a "paucity of documentation" regarding her shoulder pain and there are gaps in the records regarding Plaintiff's treatment. There is nothing in the record, nor does Plaintiff suggest, that Plaintiff received treatment during the relevant period which treatment is not documented in the record. Additionally, the record provides no support or documentation for her position that recontacting any one of the doctors who treated her on a limited basis would affect the outcome of this matter. The court finds, therefore, that Plaintiff's contention that the ALJ should have recontacted any doctor is without merit. See Ellis, 392 F.3d at 994; Clark, 28 F.3d at 830-31.

To the extent Plaintiff suggests that the ALJ should have ordered that Plaintiff undergo a consulting examination, an "ALJ is required to order medical examinations and tests only if the medical records presented to [her] do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (citing Conley v. Bowen, 781 F.2d 143, 146 (8th Cir.1986)). In the matter under consideration the record was sufficient for

the ALJ to determine whether Plaintiff is disabled. The court finds, therefore, that Plaintiff's contention that the ALJ in this case failed to sufficiently develop the record is without merit. See Barrett, 38 F.3d at 1013.

## VI.
## CONCLUSION

The court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole and that it should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint is **DENIED**; Doc. 1

**IT IS FURTHER ORDERED** that a separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 6th day of March, 2009.